UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

RONARD MCCREE,

      Petitioner,

v.                                                                    CASE NO. 6:07-cv-1078-Orl-31GJK

SECRETARY, DEPARTMENT
OF CORRECTIONS, *et al.*,

      Respondents.

_____

## **ORDER**

Petitioner initiated this action for habeas corpus relief pursuant to 28 U.S.C. Section 2254 (Doc. No. 5).  Respondents filed a response to the petition for writ of habeas corpus (Doc. No. 9), and Petitioner filed a reply to the response (Doc. No. 13).  On April 13, 2009, this Court found that an evidentiary hearing was necessary with respect to two of Petitioner's claims.   (Doc. No. 14.) Counsel was appointed to represent Petitioner, and the hearing was held on June 29, 2009.

Upon thorough review of the record and consideration of counsel's arguments at the hearing, the Court finds that Petitioner's trial counsel rendered ineffective assistance and the writ of habeas corpus must be issued.

## **A.     PROCEDURAL AND FACTUAL BACKGROUND**

On May 13, 2003, Petitioner was charged with one count of second-degree felony murder and one count of attempted robbery with a mask.  **(App. A at 1-2.)** Petitioner pled not guilty.  A jury trial was held August 27 and 28 of 2003.  The State called as witnesses, among others,

Ronda Allen ("Allen"), Deputy Joseph Ring ("Deputy Ring"), and Detective James Russell ("Detective Russell"). Detective Russell was the lead detective in the criminal investigation.

Allen testified that on February 9, 2003, she was living in a mobile home in Taft, near Orlando, Florida, and dating Deputy Ring. **(App. B at 113-14.)** She had agreed to lease the mobile home to Donald Chancy ("Chancy"). *Id*. at 114. Chancy came by the mobile home that afternoon to sign the lease and pay Allen $1,050 for rent and a security deposit. *Id*. at 114-15. Chancy paid in cash. *Id*. at 115.

At approximately 9 p.m. that same day, Allen testified, she and Deputy Ring drove her 2001 Chevy Blazer to a nearby convenience store to make a copy of the lease. *Id*. at 115-16. When they returned to the mobile home, Allen turned off the ignition, picked up her purse, and opened the car door. *Id.* at 120. As she did so, a man wearing a black mask and gloves grabbed her and said, "Give me the money! Give me the money!" *Id*.

According to Allen, the man shook her and twisted her neck. *Id*. at 120. After a short struggle, she heard Deputy Ring yell, "Orange County Sheriff, freeze!" *Id.* at 121. The man released his grip, and she fell to the ground. *Id*. at 121-22. Allen then heard a gunshot. *Id*. at 122. Allen looked up and saw two people at the end of her driveway, approximately twenty feet away. *Id*. at 122. She said that the two people, who appeared to have something covering their faces, ran to their car after the gunshot. *Id*. at 123-24. The car then sped away *Id*. at 124.

Allen testified that she heard additional gunshots and saw the man and Deputy Ring fall to the ground, struggling over the gun. *Id*. at 125-26. Deputy Ring yelled out in pain, and he told Allen to call 911. *Id*. at 126, 128.

Deputy Ring's testimony at trial largely mirrored that of Allen. When he realized that Allen was being attacked, he got out of the SUV with his off-duty weapon, a .40 caliber Glock pistol, in its holster. *Id*. at 167-68. He saw a white car at the end of the driveway with both front doors open and two individuals standing outside the car, one on each side. *Id*. at 169. The car was about twenty feet away. *Id.* at 186. The car's dome light and headlights were on, and it appeared that the two individuals were wearing masks. *Id*. at 170. He yelled, "Orange County Sheriff's Department!" and pointed his gun in their direction. *Id*. However, he quickly turned his attention to Allen, who was struggling with her assailant. *Id*. at 171-72.

Deputy Ring testified that he again announced himself as law enforcement to the person attacking Allen. *Id.* at 172. Allen then fell to the ground, and her attacker started to come at him. *Id*. at 172-73. He fired at the attacker, hitting him in the chest. *Id*. at 173. The two struggled for the gun and fell to ground. *Id*. at 174. As they went to the ground, he fired his gun, accidentally shooting himself in the left thigh. *Id*. at 174. The man landed on top of him, and Deputy Ring shot him again. *Id*. After the struggle ended, Deputy Ring instructed Allen to call 911. *Id*. at 178. The man he shot, who was subsequently identified as Brian Turner, died at the scene.

On cross-examination, Deputy Ring stated that he met Allen after she complained to police that her neighbor, Angel Perez ("Perez"), was harassing her. Id. at 183-84. According to subsequent testimony, Perez was the person who referred Chancy to Allen as a potential tenant for the mobile home. Id. at 365.

When the police arrived at the trailer, they searched the crime scene and surrounding area, but the only masks or gloves found were those that had been worn by Brian Turner. *Id*. at 223. No weapon was found other than Deputy Ring's firearm. *Id*. at 223.

A bloodhound tracked a scent to a truck parked at a nearby bakery.  *Id*. at 267-69.  Inside

the truck, police found Desha Turner, who later admitted that he was Brian Turner's cousin and

had been a passenger in the white car that had been at the end of Allen's driveway -- a Dodge

Intrepid.  *Id*. at 269-70, 307-09.  He also admitted that Petitioner had been the driver of the car.

*Id*.

Detective Russell testified that he was able to locate Petitioner through one of Petitioner's

uncles approximately two and a half months after the incident occurred, and that Petitioner

voluntarily agreed to an interview.  *Id*. at 314-15.  At the end of the interview, Petitioner was not

placed under arrest.  *Id*. at 315-316.  The next day, Detective Russell obtained an arrest warrant

for felony murder and served it on Petitioner.  *Id*. at 317.  Petitioner was placed under arrest and

transported to the Sheriff's Office.  *Id.* at 317-18.  While under arrest, he gave a recorded

statement to police concerning the events on the night of February 9, 2003.  Petitioner's statement

was played for the jury at trial.  *Id*. at 319-38.

In the recorded statement, Petitioner stated that Desha and Brian Turner, along with two

women, arrived at his home at approximately 8:00 p.m. in a white Dodge Intrepid, which Brian

Turner was driving.  *Id*. at 321.  The five of them drove around town for awhile, and Petitioner

was eventually dropped off at his apartment.  *Id*. at 322.  Later that night, the Turners returned to

Petitioner's apartment without the women.  *Id*.  Petitioner got into the back seat of the Intrepid

behind Brian Turner, who was driving.  *Id*. at 323.

Petitioner told police that the three of them drove around town some more and then

stopped at a 7-Eleven.  *Id*.  When they stopped at the store, Brian Turner asked Petitioner to

switch places with him and drive the car, which he did.  *Id*. at 324.  Petitioner stated that Brian

4

Turner received numerous calls on his cell phone that night, one of which was from someone who told Brian Turner about a "sweet lick," a phrase meaning "easy robbery" in street terminology. *Id*. at 324-25.

Petitioner said that after they left the 7-Eleven, Brian Turner told him where to drive but did not tell him why they were driving there. *Id*. at 325-26. Brian Turner's directions eventually led them to a trailer, where Brian Turner got out of the car and banged on the front door. *Id*. at 326-27. After no one answered, Brian Turner returned to the car and told Petitioner to drive off. *Id*. at 327. Shortly after Petitioner pulled out of the driveway and began driving north, a car passed in the other direction. *Id*. at 328. Brian Turner said, "There they go, there they go," and told Petitioner to turn around and go back. *Id*. at 329.

Petitioner drove back to the trailer, and Brian Turner again got out of the car. *Id*. at 330. Petitioner said he saw Brian Turner go up to a white woman who was getting out of an SUV. *Id*. He told police that he remained in the car with Desha Turner, but that he pulled up to see what Brian Turner was doing. *Id*. at 330-31. Petitioner said he then saw Brian Turner "tussling" with the lady, slapping her. *Id*. at 331. According to Petitioner, Desha Turner then got out of the car and said he was going to go help his cousin. *Id*. Petitioner saw Desha Turner run up to the SUV, stopping when a white man jumped out of the SUV and announced himself as a law enforcement officer. *Id*. at 331-32. When Petitioner saw the man reach for his gun, he said, he quickly drove off. *Id*. at 332. He said he heard approximately five gunshots while he was driving away. *Id*. at 333.

Petitioner told police that he later received a phone call from Desha, who said he was hiding in a truck. *Id*. at 333-35. Petitioner stated that he parked the white Intrepid in a Winn

Dixie parking lot and took the two cell phones that were left in the car to Desha Turner's mother. *Id*. at 335-26.  Petitioner told police that there were no firearms in the car that night. *Id*. at 336.

Upon the conclusion of Petitioner's recorded statement, Detective Russell testified that the police never found any masks or gloves in the surrounding area or in the white Intrepid, which was recovered from the Winn Dixie parking lot. *Id*. at 364-65.  On cross-examination, Detective Russell admitted that, in addition to the information contained in his recorded statement, Petitioner had told police that he thought the reason Brian Turner wanted to go to Taft that night was to sell drugs to someone. *Id*. at 374.

Desha Turner testified on behalf of Petitioner.[1] *Id*. at 406.  He testified that he and Petitioner were good friends and had known each other for approximately eleven years, but that Petitioner had probably only met Brian Turner twice prior to the night of the incident. *Id*. at 406-07.  Desha Turner said that Petitioner was not aware that Brian Turner would be with him when they drove to Petitioner's home that night. *Id*. at 408-09.  Desha Turner stated that his cousin had smoked a large amount of marijuana and had taken approximately three ecstacy pills. *Id*. at 410-13.

Desha Turner admitted that he lied when he was interviewed by the police after they found him hiding in the truck. *Id*. at 417-19.  However, he stated that he told police the truth a few days later, after Detective Russell called his mom and told her that he could help Desha "get out." *Id*. at 422.  In the second interview, Desha picked Petitioner out of a photo lineup and told police that Petitioner was the driver of the car. *Id*. at 424-25.  He told police that he was asleep in the front seat but that he woke up when he heard Brian Turner say, "There they go." *Id*. at

---

[1]Petitioner was tried separately from Desha Turner, who was acquitted.  (Doc. 31 at 9-10).

424-25. He said that Brian Turner instructed Petitioner to turn the car around, which he did, and that they pulled up in front of a mobile home. *Id*. at 425-26. In the statement he gave to the police, Desha Turner said that Brian Turner then got out of the car, after which he got out of the car to call him back. *Id*. at 426. (However, at trial, Desha Turner testified that his statement about wanting Brian Turner to return was a lie, and that he actually just got out and stood up next to the car. *Id*. at 427.) He testified that Petitioner remained in the car, never opening his door, and that Petitioner drove off before any shots were fired. *Id*. at 427-28, 431.

Petitioner took the stand in his own defense. *Id*. at 438. He testified that he and Desha Turner were good friends and they would go out together three to four times a week. *Id*. at 439. Petitioner testified that while the group was driving around on February 9, 2003, Brian Turner received numerous calls on his cell phone. *Id*. at 441. When asked why the group drove to Taft that night, Petitioner testified that Brian Turner told him, while they were stopped at the 7-Eleven, that he had a "jug" to sell drugs to in the Taft area. *Id*. Petitioner said that "jug" means a person who uses crack cocaine. *Id*.

After they stopped at the 7-Eleven, Brian Turner said his head was hurting and asked Petitioner to drive. *Id*. at 443. While Petitioner was driving, Brian Turner got a phone call from someone who told him about a "sweet lick"[2] -- an easy robbery, in street terminology -- and asked Petitioner if he wanted to be "down with it." *Id*. at 444. Petitioner said he told Brian Turner no. *Id*. Petitioner said that Brian Turner never revealed any details about the robbery, such as when or where it was to occur, or who the intended victim was. *Id*. at 445. He also said he did not

---

[2] Petitioner testified that "sweet lick" meant an easy taking of money or property. *Id*. at 444.

think the robbery was going to happen that night because there were no weapons in the car, and no one looked as though they intended to commit a robbery. *Id*. at 445.

Petitioner testified that he continued to drive the car to Taft, following Brian Turner's directions and thinking that Brian Turner intended to go sell drugs. *Id*. at 446-47. Brian Turner told Petitioner to pull up to a trailer, and without explaining what he intended to do, got out of the car. *Id*. at 447. Brian Turner knocked on the trailer door, entered, and came out with another man, who was unknown to Petitioner. *Id*. The unknown man and Brian Turner got into the backseat of the car. *Id*. at 447-48.

Petitioner testified that both Brian Turner and the unknown man began giving him driving directions, which eventually led them to another trailer. *Id*. at 448-49. Again without saying what he was going to do, Brian Turner got out of the car and knocked on the door of the trailer. *Id*. at 449. Petitioner testified he thought Brian Turner was going to sell drugs to whoever was inside the trailer. *Id*. When no one answered the door, Brian Turner got back into the car and told Petitioner to go back to where they had just come from. *Id*. at 449-50. As Petitioner was doing so, he noticed a car pass by, and Brian Turner said, "There they go." *Id*. Brian Turner and the other man told Petitioner to turn the car around and go back to the trailer. *Id*. Petitioner testified that he thought the person or persons inside the car were the person or persons to whom Brian Turner was going to sell drugs. *Id*. Petitioner turned the car around and drove back to the trailer, stopping in front of the driveway. *Id*. at 451.

Petitioner testified that Brian Turner got out of the car and walked up to an SUV that had not been at the trailer when they were there the first time. *Id*. at 452. He said that he could not see what Brian Turner was doing, so he pulled the car up a little. *Id*. at 452-53. He then saw

Brian Turner slapping a lady. *Id*. at 453. Desha Turner and the unknown man in the backseat got out of the Intrepid just as a man got out of the front passenger seat of the SUV. *Id*. at 453. Petitioner stated that he saw the man pull out a gun and announce himself as a police officer. *Id*. at 453-54. Thinking it was a drug bust, he put the car in drive and sped away. *Id*. at 454. The unknown guy man who had been in the backseat returned to the car before Petitioner drove off, but Desha Turner was left at the scene. *Id*. at 480, 485. Petitioner testified that he drove the unknown man back to his trailer, and the man told him not to come back. *Id*. at 485.

Petitioner testified that, several months later, when his uncle told him to contact Detective Russell, he was willing to go give a statement because he did not believe he had done anything wrong. *Id*. at 455-56. Petitioner said that during his first statement to the police, which was not recorded, he told Detective Russell that there had been a fourth person in the car that night, but that he did not know who the man was. *Id*. at 469-71. When asked why he did not mention the fourth person in the second interview -- the one that was recorded and played to the jury -- Petitioner said it was because Detective Russell told him only to answer the questions he was asked, and he was not asked about the fourth man. *Id*. at 470-71.

At the conclusion of the trial, the jury returned a verdict of guilty on both counts. (App. A at 4-5.) The jury made a special finding that Brian Turner wore a mask, but that Petitioner did not. *Id*. at 6-7. Petitioner was sentenced to a mandatory term of life in prison as to the felony murder count and to a fifteen-year minimum mandatory term of imprisonment as to the attempted robbery count. *Id*. at 8-18.

Petitioner appealed, and the Florida Fifth District Court of Appeal affirmed *per curiam*. *Id*. at 19, 63. Petitioner filed a motion for post-conviction relief pursuant to Florida Rule of

Criminal Procedure 3.850. (App. D.) The state trial court denied the motion, and Petitioner appealed. *Id*. The state appellate court affirmed *per curiam*. *Id*. Petitioner then filed a state petition for writ of habeas corpus, alleging ineffective assistance of appellate counsel. (App. E.) The state appellate court denied the petition. *Id*.

## B.    FEDERAL HABEAS PROCEEDINGS

Petitioner initiated the instant federal habeas corpus proceeding on June 20, 2007. (Doc. No. 1.) On April 13, 2009, this Court found that an evidentiary hearing was needed in regard to two of petitioner's claims. Both of the claims involved allegations that Petitioner's counsel rendered ineffective assistance by failing to argue that Brian Turner's death resulted from his own independent act, and for failing to request a jury instruction to that effect. Counsel was appointed to represent Petitioner, and an evidentiary hearing was held on June 29, 2009.

The first witness to testify at the evidentiary hearing was Arnold Harrison ("Harrison"), Petitioner's trial counsel. Doc. 31 at 5. Harrison testified that prior to Petitioner's trial he researched the independent act doctrine to determine whether it would apply to Petitioner's case. *Id*. at 12. It was his understanding, he testified, that to obtain an independent act instruction, there had to be evidence that the defendant had been involved in an actual, ongoing criminal act. *Id*. at 23. He testified that he thought that there was not enough evidence to ask for the instruction in Petitioner's case, because there was no evidence of an ongoing drug deal.[3] *Id*. at

_____

[3]Harrison stated that he could not recall Petitioner telling detectives that there was supposed to be a drug deal that night, and he did not have any information that led him to believe that Brian Turner had been called by someone regarding a drug deal. *Id*. at 12-13. When questioned about the phone calls Brian Turner received the night of the incident, Harrison testified that he could not recall there being two phone calls, one dealing with a "jug" and another a "sweet lick." *Id*. at 26. Instead, Harrison stated that he remembered both of those terms coming up in regard to a single call, with Brian Turner saying something to the effect of "some jug says she has a sweet lick." *Id*. at 12, 26-27.

12-13, 22, 23, 24, 25. Additionally, he noted that it would have been incredible to argue an independent act defense because there were no drugs found on Brian Turner; there was no indication that Petitioner was going to receive a benefit from a drug deal; and it was "ridiculous" to believe that Allen, who was dating a deputy sheriff, would call Brian Turner to buy drugs.[4] *Id.* at 13, 24, 25.[5] Harrison stated that Petitioner always maintained that he did not know what was going to happen that night, and that he had not participated in any criminal act other than being the person Brian Turner directed to drive. *Id.* at 19.

Harrison admitted that Petitioner testified that he thought he was driving Brian Turner to a drug deal, and that he himself made this point in his opening and closing arguments to the jury. *Id.* at 20, 22. However, Harrison said his understanding of the independent act doctrine was that, while Petitioner did not have to be formally charged with a drug offense, the doctrine would not apply in Petitioner's case without evidence of an ongoing drug offense. *Id.* at 20-21.

Harrison also testified that he thought that it would not have been in Petitioner's best interest to ask for the instruction. *Id.* at 25, 28. Harrison said he did not think it was a smart move to argue both independent act and actual innocence, because he thought it would hurt Petitioner's credibility to assert that he thought he was going to a drug deal when there was no evidence that a drug deal was going to take place. *Id.* at 28. Harrison also said he did not think

---

[4] Harrison stated that to argue this to a jury, he "would have had to make the assumption that [Allen] either didn't care or the deputy perhaps was using drugs as well." *Id.* at 25.

[5] Harrison admitted that he would have asked for the independent act instruction had there been evidence of an ongoing drug deal in which Petitioner had participated. *Id.* at 24-25, 30-31.

that conceding guilt to an uncharged crime -- the drug offense -- was a better strategy than arguing that he was completely innocent. *Id*. at 30-31.

When asked whether Petitioner's trial testimony that he thought he was going to a drug deal came as a "surprise," Harrison answered that it wasn't a surprise but he advised Petitioner that it was not the best defense under the circumstances. *Id*. at 27-28.

On redirect examination, Harrison testified that his interpretation of the facts as they came out at trial led him to believe that he was without legal authority to ask for the independent act instruction. *Id*. at 35. Even given Petitioner's testimony at trial, Harrison felt there was no basis on which to ask for the instruction, but admitted that Petitioner's testimony could be subject to different interpretations. *Id*.

Desha Turner also testified at the evidentiary hearing. *Id*. at 36. Desha testified that his trial occurred before Petitioner's trial and that he was acquitted on both counts. *Id*. at 37-38, 41. He stated that his defense at trial was that he was asleep and did not know what was going on. *Id*. at 41. He admitted that much of what he had said -- to the police, to Harrison and under oath at his trial -- was a lie. *Id*. at 43-44. He said that he and his cousin had planned the robbery but decided not to tell Petitioner because they thought he was a coward and because they did not want to share the proceeds. *Id*. at 40, 48. He further testified that Petitioner's understanding that night was that they were traveling to Taft for a drug deal. *Id*. at 38, 40, 48. He stated that it was something Petitioner would likely believe because he and his cousin were known to sell drugs. *Id*. at 48.

Desha Turner testified that he and his cousin and Petitioner picked up a fourth passenger, Angel Perez ("Perez") before the attempted robbery. *Id*. at 39. He stated that Perez was the

person who told Brian Turner about the prospect of robbing Allen, because Perez owed him money for a prior drug sale, and the money from the Allen robbery was going to satisfy the debt. *Id*.[6]

The final witness at the hearing was William J. Sheaffer ("Sheaffer"), an experienced criminal defense attorney, who testified as an expert in criminal defense under Florida law. *Id*. at 51. Sheaffer disagreed with Harrison's interpretation of the independent act doctrine. Sheaffer said that his understanding was that a defendant would be entitled to an independent act instruction so long as "any evidence" had been presented that would support the theory. *Id*. Based on his analysis of the case law, Sheaffer said, the evidence did not even have to be credible or reliable to justify the independent act instruction. *Id*. at 52-53.

Sheaffer testified that, in his opinion, there was enough evidence produced at Petitioner's trial to support an independent act instruction, and the trial judge would have given the instruction if Harrison had requested it. *Id*. at 64, 65. Moreover, Sheaffer opined, the trial judge would have run a high risk of reversal on appeal had he denied such request. *Id*.

In Sheaffer's opinion, Harrison had -- perhaps inadvertently -- based Petitioner's entire trial on an independent act defense, by repeatedly referring to Petitioner's understanding that he was driving Brian Turner to a drug deal. *Id*. at 68, 71-72. Sheaffer testified that the notion of this drug deal was woven throughout Petitioner's entire trial, and that Harrison had laid the groundwork for the independent act instruction but failed to follow through and ask for it. *Id*.

---

[6] Harrison testified that he deposed Perez prior to trial. *Id*. at 16. Perez denied any involvement in any wrongdoing, but he did state that he had been a user of cocaine and that Allen had used drugs with him in the past. *Id*. at 16-17.

Sheaffer also thought it noteworthy that the only significant point as to which the State was unable to impeach Petitioner was his contention that he thought he was driving Brian Turner to Taft for a drug deal. *Id*. at 65-66.

Sheaffer also opined that an independent act defense would not have contradicted an actual innocence defense, which Harrison pursued at trial. *Id*. at 63, 66-67. Specifically, Sheaffer said it would not have been inconsistent to argue that Petitioner drove Brian Turner to Taft that night to sell drugs, not to commit a robbery, and therefore he was innocent of the attempted robbery charge, and the felony murder charge that grew out of that attempted robbery.

In Sheaffer's opinion, after the repeated references to the purported drug deal at Petitioner's trial, Harrison's failure to request the independent act instruction constituted ineffective assistance of counsel. *Id.* at 68-69. In his view, the absence of that instruction eliminated the possibility that the jury would understand that, if Petitioner was only at the scene because he thought he was going to a drug deal, as a matter of law he could not be held responsible for Brian Turner's independent act. *Id.*

## C.    GOVERNING LEGAL PRINCIPLES

Because Petitioner filed his petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Henderson v. Campbell*, 353 F.3d 880, 889-90 (11th Cir. 2003). The AEDPA "establishes a more deferential standard of review of state habeas judgments," *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001), in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002); *see also Woodford v.*

14

*Visciotti*, 537 U.S. 19, 24 (2002) (recognizing that the federal habeas court's evaluation of state-court rulings is highly deferential and that state court decisions must be given the benefit of the doubt).

Pursuant to the AEDPA, habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The phrase "clearly established Federal law," encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Schwab v. Crosby*, 451 F.3d 1308, 1324 (11th Cir. 2006) (stating that the federal law relevant to this analysis is the United States Supreme Court precedent "in existence at the time the conviction became final").

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent consideration a federal court must consider." *Maharaj v. Secretary for Dep't. of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005). The meaning of the clauses was discussed by the Eleventh Circuit Court of Appeals in *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001):

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the

United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

If the federal court concludes that the state court applied federal law incorrectly, habeas relief is appropriate only if that application was "objectively unreasonable." *Id*.

Finally, under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." A determination of a factual issue made by a state court, however, shall be presumed correct, and the habeas petitioner shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. *See Parker*, 244 F.3d at 835-36; 28 U.S.C. § 2254(e)(1).

## DISCUSSION

As discussed in this Court's prior order, Petitioner asserts two claims of ineffective assistance of counsel centered on the independent act doctrine -- that counsel was ineffective for failing to request an independent act jury instruction and pursuing a defense based on the independent act of his co-defendant. (Doc. 14 at 1.) Because of the overlap between the claims, the Court will address them together.

Under Florida law, the independent act doctrine applies "when one cofelon, who previously participated in a common plan, does not participate in acts committed by his cofelon, 'which fall outside of, and are foreign to, the common design of the original collaboration.'" *Ray v. State*, 755 So. 2d 604, 609 (Fla. 2000) (quoting *Ward v. State,* 568 So. 2d 452, 453 (Fla. 3d DCA 1990)). Under these limited circumstances, "a defendant whose cofelon exceeds the scope of the original plan is exonerated from any punishment imposed as a result of the independent

act." *Id*.  The Florida standard independent act jury instruction reads, in pertinent part, as

follows:

> If you find that the crime alleged was committed, an issue in this case is whether
> the crime of (crime alleged) was an independent act of a person other than the
> defendant.  An independent act occurs when a person other than the defendant
> commits or attempts to commit a crime
>
> . . .
>
> 1. which the defendant did not intend to occur, and
>
> 2. in which the defendant did not participate, and
>
> 3. which was outside of and not a reasonably foreseeable consequence of
> the common design or unlawful act contemplated by the defendant.
>
> . . .
>
> If you find that the (crime alleged) was an independent act of [another] [(name of
> individual)], then you should find (defendant) not guilty of the crime of (crime
> alleged).
>
> Note to judge
>
> If the name of the other person is known, it should be inserted here; otherwise, use
> the word "another."

*In re Standard Jury Instructions in Criminal Cases (97-1)*, 697 So. 2d 84, 96 (Fla. 1997).

In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court

established a two-part test for determining whether a convicted person is entitled to relief on the

grounds that his counsel rendered ineffective assistance.  First, the Court must determine

whether counsel's performance was deficient and "fell below an objective standard of

reasonableness"; second, the Court must determine whether that performance prejudiced the defense.[7] *Id*. at 687-88. The Court must find in Petitioner's favor on both prongs to justify relief.

## A. Reasonableness

The state contends that even if Harrison had requested the independent act instruction, he would not have received it. Obviously, unless Petitioner was entitled to the instruction, Harrison's performance in not asking for it could not have been deficient. However, the bar for entitlement to the instruction is extremely low under Florida law.

"Where *any evidence* which would support the theory of independent act has been presented, the defendant is entitled to the jury instruction." *Parker v. State*, 458 So. 2d 750, 752 (Fla. 1984) (emphasis added). *See also Motley v. State*, 20 So. 2d 798, 800 (Fla. 1945) (describing law as well-settled that a defendant "is entitled to have the jury instructed on the law applicable to his theory of defense where there is evidence introduced in support thereof" and holding that failure to give requested instruction in such a case is necessarily prejudicial to the defendant). In the instant case, there was a substantial amount of evidence presented that, if believed, would support the theory of independent act -- specifically, a theory that Petitioner believed he was assisting Brian Turner in the commission of a (non-violent) drug deal, that he did not know about the attempted robbery in advance or take part in it, and that Brian Turner's attempt to rob Allen was outside of and a not reasonably foreseeable consequence of the drug deal he thought had been planned.

---

[7]In *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), the Supreme Court clarified that the prejudice prong of the test does not focus solely on mere outcome determination; rather, to establish prejudice, a criminal defendant must show that counsel's deficient representation rendered the result of the trial fundamentally unfair or unreliable.

Testimony from Petitioner and Detective Russell tended to corroborate this position. And Harrison also elicited testimony from Petitioner and Detective Russell that tended to corroborate this position. Petitioner testified on the stand that when the group stopped at the 7-Eleven, Brian Turner told him that he had a "jug" to sell drugs to in Taft. App. B at 441. And Petitioner repeated this central point several other times during his testimony.[8] Harrison reinforced this point, telling the jury during both his opening and closing statements that Petitioner drove Brian Turner to Taft to sell drugs. *See* App. B at 107, 520. On cross-examination, Harrison asked Detective Russell if Petitioner had told him that Brian Turner was in Taft to sell drugs, and Russell said, "I believe he did, sir, him or Desha." App. B at 374-75. Petitioner also testified that Brian Turner, after receiving the phone call notifying him of the easy robbery, asked him if he wanted to participate -- though without sharing any of the details, such as the date, location, or target -- and he declined. App. B at 444.

Though the jury was free to disbelieve it, all of this testimony supported the notion that Petitioner thought he was headed to a drug deal, and that Brian Turner's attempt to commit a strong-arm robbery came as a shock to him.[9] As such, it satisfied Petitioner's comparatively

---

[8]For example, Petitioner testified that he thought the group was going to Taft for Brian Turner to sell drugs. App. B at 446. He testified that he thought they were at the trailer in Taft for Brian Turner to sell drugs ,and that he didn't think anything of it because Brian and Desha Turner were known to sell drugs. App. B at 449 He testified that, after they drove away from the trailer the first time, and Brian Turner spotted an oncoming car said, "There they go," he thought "they" were the people to whom Brian Turner planned to sell drugs, because that was why they were going to Taft. App. B at 450. And Petitioner testified that when Deputy Ring yelled "Stop!" and identified himself as a law enforcement officer he believed he was witnessing a drug bust. App. B at 454.

[9]Further support for this notion is provided by the fact that there was no evidence -- testimonial or otherwise -- that there were weapons in the Intrepid, and no weapon was found on or near Brian Turner's body.

minor burden of establishing an entitlement to an independent act instruction. *See, e.g.*, *Charles v. State*, 945 So. 2d 579 (Fla. 4th DCA 2006) (reversing felony murder conviction for failure to give requested independent act instruction where defendant testified to version of events that would support the instruction, even though his testimony conflicted with his co-defendant's testimony and his own recorded statement to the police, and there was no physical evidence supporting his version); *and see Rodriguez v. State*, 571 So. 2d 1356 (Fla. 2d DCA 1990) (reversing conviction for felony murder for refusal to give the instruction where, although defendant had no knowledge as to why co-felon shot gas station attendant after failed armed robbery, videotape evidence and fact that co-felon did not take money from the store supported theory that the shooting was simply a malicious act rather than in furtherance of the jointly planned robbery); *and see McGee v. State*, 792 So. 2d 624 (Fla. 4th DCA 2001) (reversing for failing to give independent act instruction where defendant told police he drove co-defendant to victim's house solely so co-defendant could buy drugs for defendant from victim, and that he was unaware that co-defendant had a gun or that he planned to rob the victim.

Respondents maintain that the independent act instruction was "legally inapplicable given the facts and defense offered at trial." (Doc. No. 26 at 6.) Specifically, they assert that the instruction would have been inappropriate because Petitioner's defense at trial was that he was actually innocent, denying any involvement in a crime. *See Pestano v. State*, 980 So. 2d 1200, 1203 (Fla. 3d DCA 2008) (holding independent act instruction inappropriate where defense theory at trial, supported by defendant's testimony, was that defendant had no involvement in crime); *see also Boyd v. State*, 912 So. 2d 26, 27 (Fla. 4th DCA 2005) (holding that counsel could not be ineffective for failing to request independent act instruction where defense at trial

was that defendant accused of armed robbery had no common plan to participate in any crime

with co-defendant).  And Petitioner *did* argue that he was innocent of any involvement

whatsoever in the attempted strongarm robbery.  However, unlike the defendants in *Pestano* and

*Boyd*, who denied *all* criminal involvement, Petitioner repeatedly testified that he believed he

was aiding Brian Turner in a criminal act -- *i.e.*, driving him to a drug deal.  By denying *all*

criminal involvement, the defendants in *Pestano* and *Boyd* rendered themselves unable to

establish one of the requirements of the independent act instruction -- the common design or

unlawful act from which their co-felon deviated.  That is not the case here.[10]

Having determined that the trial court would have given the independent act instruction if

Petitioner's counsel had requested it, the Court must determine whether the failure to request it

was deficient -- *i.e.*, whether it fell below *Strickland*'s "objective standard of reasonableness."

When deciding whether counsel's performance was deficient, a court must adhere to a strong

presumption that counsel's conduct falls within a wide range of reasonable professional

assistance.  *Strickland*, 466 U.S. at 689.  Because "it is all too easy to conclude that a particular

act or omission of counsel was unreasonable in the harsh light of hindsight," *Bell v. Cone*, 535

U.S. 685, 702 (2002), a reviewing court "must judge the reasonableness of counsel's challenged

---

[10]In addition, there was no evidence presented at trial that would have presented the trial court from giving the instruction.  For example, an independent act instruction is inappropriate when the unrebutted evidence shows the defendant knowingly participated in the underlying criminal enterprise that resulted in the killing.  *Roberts v. State*, 4 So. 3d 1261, 1264 (Fla. 5th DCA 2009). Though he admitted assisting in what he thought would be a drug deal, Petitioner repeatedly denied knowingly participating in the attempted robbery that resulted in Brian Turner's death.  Petitioner also testified that, when approached by Brian Turner about participating in the "sweet lick" -- presumably but not necessarily the Allen robbery -- he refused without finding out any of the specifics, such as when it would occur and who the victim would be.

conduct on the facts of the particular case, viewed as of the time of counsel's conduct."
*Strickland*, 466 U.S. at 690.

Respondents contend that Harrison's decision not to request the independent act instruction was a reasonable, strategic decision under the circumstances. Whether a particular decision by counsel was tactical or strategic is a question of fact, *Hardwick v. Crosby*, 320 F.3d 1127, 1163 (11th Cir. 2003), and the state court's resolution of that issue enjoys a strong presumption of correctness. *See* 28 U.S.C. § 2254(e)(1); *Jackson v. Herring*, 42 F.3d 1350, 1367 (11th Cir. 1995); *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991). The relevant question, however, "is not whether counsel's choices were strategic, but whether they were reasonable," *Putman v. Head*, 268 F.3d 1223, 1244, and whether a particular strategic decision was reasonable is a question of law, *Hardwick*, 320 F.3d at 1163; *Jackson*, 42 F.3d at 1367; *Horton*, 941 F.2d at 1462. "This recognizes that to uphold a lawyer's strategy, a court need not attempt to divine the lawyer's mental processes underlying the strategy, but instead must simply determine whether the course actually taken by counsel might have been reasonable." *Crawford v. Head*, 311 F.3d 1288, 1314 (11th Cir. 2002) (internal citations omitted).

In support of their contention that Harrison's strategic decision not to request the independent act instruction was reasonable, Respondents assert that (1) there was no legal basis to argue an independent act defense because there was no evidence to corroborate Petitioner's testimony of a drug deal, (2) arguing an independent act defense would have strained Petitioner's credibility given the facts of the case, and (3) arguing an independent act defense would have been "unsound trial strategy."

Respondents' first argument mirrors Harrison's testimony at the evidentiary hearing that he believed that he lacked a legal basis to request the instruction because there was no evidence to corroborate Petitioner's testimony about the drug deal -- *e.g.,* no evidence that Petitioner would have benefitted from the deal, or that Brian Turner was carrying drugs when he was shot. This reflects a misunderstanding of Florida law. As discussed above, Petitioner would have been entitled to the jury instruction so long as there was "any evidence" presented at trial, "no matter how weak or flimsy," to support the theory of independent act. *Charles v. State*, 945 So. 2d at 582. It is beyond dispute that such evidence was presented at this trial. Moreover, there is no requirement in the case law that a defendant show that the "common design" reached fruition, or that the contemplated unlawful act actually occurred -- or that his cofelon intended for it to occur.[11]  To the same end, the plain language of Florida's standard independent act jury instruction does not require the actual occurrence of the common design or contemplated unlawful act from which the independent act deviates.

As such, whether Harrison's decision to not seek the independent act instruction was properly characterized as strategic or tactical, it was unreasonable because it was based on a misunderstanding of Florida law. *See Hardwick*, 320 F.3d at 1163 (stating that tactical or strategic decisions based on misunderstanding of law are *per se* unreasonable). Furthermore, to the extent Respondents argue that Harrison did not ask for the instruction because Petitioner was

_____

[11] For example, in *McGee v. State*, 792 So. 2d 624, 627 (Fla. 4th DCA 2001), the defendant admitted giving money to his co-defendant to go buy drugs for him while he waited in the car. Instead, the co-defendant killed the drug dealer, apparently while trying to rob him. *Id.* The appellate court reversed the defendant's second-degree murder conviction based on the trial court's refusal to give the independent act instruction. *Id.* Notably, there was no evidence that the co-defendant attempted (or even intended) to buy drugs from the victim before killing him, and no suggestion by the appellate court that such an attempt (or intent) was required.

not charged with any crime related to the sale of drugs, *see* Doc. No. 26 at 10, this argument is without merit. There is also no requirement in the case law or in the plain language of the instruction that the defendant actually be charged with an underlying criminal act in order to receive the instruction.

Respondents' second argument is that Harrison's strategy was reasonable in that it was not in Petitioner's best interest to argue an independent act defense. In support of this argument, Harrison testified that to pursue such a defense he would have had to make the "ridiculous" argument that Allen, who was dating a deputy sheriff, was buying and using drugs. Again, this argument is based on the misunderstanding that Petitioner was not legally entitled to the independent act instruction unless he showed that Brian Turner intended to sell drugs the night he was killed. As such, it is *per se* unreasonable.

Respondents' final argument is that it would have been strategically unsound for Harrison to argue an independent act defense because to do so he would have had to admit to Petitioner's involvement in a crime, and because that defense would have conflicted with or been averse to Petitioner's defense that he was actually innocent. But this argument conflicts with the actual defense offered at trial. Harrison admitted to the jury in both the opening and closing statements that his client intended to participate in a crime -- the supposed drug deal -- and Petitioner repeatedly made the same admission on the stand. Moreover, the defense is illogical. Admitting participation (or an intent to participate) in a drug deal is not at all inconsistent with a claim of actual innocence with regard to the attempted robbery and felony murder charges for which Petitioner was standing trial. As noted by Sheaffer at the evidentiary hearing, Harrison actually tried Petitioner's case on an independent act theory by presenting testimony and argument that his

client thought he was driving to a drug deal. However, instead of completing the picture with an independent act instruction, thereby integrating the legal defense with the facts presented, he chose instead to rely on an inconsistent defense, thus undermining the credibility of his own case. This strategic decision was clearly unreasonable.

For these reasons, the Court finds that Harrison's conduct in failing to ask for and argue an independent act instruction fell below *Strickland's* objective standard of reasonableness. The Court must now address whether this performance prejudiced Petitioner's defense.

## B.    Prejudice

The second prong of *Strickland* requires that a defendant establish that his attorney's dereliction was so "serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. To demonstrate prejudice, Petitioner must establish that his counsel's deficient performance rendered "the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

As detailed above, Petitioner's testimony at trial that he thought he was driving to a drug deal, not a robbery, was enough to support an independent act defense. As such, the trial court would have been required to give the instruction if requested. Florida courts recognize that the prejudice in such a situation is so severe that a reversal is automatic. *See, e.g., Bryant v. State*, 412 So. 2d 347, 350 (Fla. 1982) (reversing for failure to give requested independent act instruction where there was evidence presented that might support it even though, "during argument to the jury, defense counsel made clear his position as to the theory of independent act," because jury "was not apprised of any legal basis upon which it could consider this position."). *See also Motley v. State*, 20 So. 2d 798 (Fla. 1945) (stating that the "a defendant is

entitled to have the jury instructed on the law applicable to his theory of defense where there is evidence introduced in support thereof" and the failure to do so deprives the accused of a lawful trial).

The unique problem posed by the failure to provide the independent act instruction is clearly demonstrated in this case. The trial judge instructed the jury as follows;

> Before you can find the defendant guilty of second-degree felony murder, the State must prove the following four elements beyond a reasonable doubt: One, that Brian Turner is dead; two, that the death occurred as a consequence of and while the crime of attempted robbery was being committed, or the death occurred as a consequence of and while there was an attempt to commit robbery. Ronard McCree was not the person who actually killed Brian Turner but did knowingly aid, abet, counsel, hire or otherwise procure the commission of attempted robbery, that's number three. And number four is, the person who actually killed Brian Turner was not involved in the commission or the attempt to commit the armed [sic] robbery.

App. B at 530. Three of those four elements are obviously present here. It was undisputed that Brian Turner was dead, that his death occurred as a consequence of an attempted robbery, and that the person who killed him was not a participant in the attempted robbery. The only element in dispute was the third one: whether Petitioner, though not the person who killed Brian Turner, "did knowingly aid, abet, counsel, hire, or otherwise procure the commission of attempted robbery."

The judge also instructed the jury:

> If the defendant helped another person or persons attempt to commit a crime, the defendant is a principal and must be treated as if the defendant had done all the things the other person or persons did, if the defendant had a conscious intent that the criminal act be done and the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist or advise the other person or persons to actually attempt to commit the crime.

App. B at 532.  A diligent juror, interpreting this instruction in combination with the felony murder instruction (and without an independent act instruction), could logically conclude that Petitioner was guilty of attempted robbery, and therefore felony murder, even if he never knew about any plans to commit a robbery.  In accordance with the language of the instruction, Petitioner admitted that he helped Brian Turner attempt to commit "a crime" -- the crime of selling drugs -- and that he had a conscious intent that that criminal act be done, and that he assisted Brian Turner by driving him to where he believed the crime would occur.  Therefore, according to the instruction, Petitioner "must be treated as if [he] had done all the things [Brian Turner] did" -- and one of the things that Brian Turner undisputedly did was knowingly attempt to commit armed robbery.[12]

The independent act instruction was crucial in this case to inform the jury how to properly resolve the issue of Petitioner's criminal liability, to explain  to them that Petitioner's participation with Brian Turner in one crime did not necessarily make him responsible for all of Brian Turner's crimes, that driving Brian Turner to an attempted robbery did not make him responsible for that crime (and Brian Turner's death) unless he knew the attempted robbery was going to occur.  The Court finds that Harrison's failure to ask for the instruction rendered these proceedings unreliable.

---

[12]Even though both Allen and Deputy Ring testified that the two individuals standing outside the white car were wearing masks, and even though the jury found that Brian Turner was wearing a mask, the jury made a special finding that Petitioner was not wearing a mask.  This special finding is consistent with a belief on the part of the jury that Petitioner was at the crime scene expecting a drug deal, not a robbery.

## C.    Application of § 2254(d)

To obtain habeas relief, Petitioner must also satisfy the dictates of § 2254(d).  Thus, the Court must now determine whether the state court's rejection of this claim was contrary to or an unreasonable application of *Strickland*, or an unreasonable determination of the facts in light of the evidence presented.

The state court found that Harrison's failure to request the instruction did not constitute ineffective assistance.  Specifically, the state court found as follows:

> Defendant contends in ground 1 that trial counsel was ineffective for failing to request a jury instruction regarding independent act of co-felon and for failing to make an argument in support of such request and Defendant's theory of defense.  No prejudice arose from the fact that Defendant's trial attorney did not advise him of an independent act defense or request a jury instruction on such a defense.  This is so because the elements of independent act did not apply to the facts of the case, and also because even if such an instruction had been requested and given, there is no reasonable probability that such an instruction or defense would have resulted in a different outcome.
>
> There was no reasonable probability that Defendant's attorney could have obtained an independent act instruction.  This is so because Defendant, by his own admission to police, admitted that he knew the decedent, Defendant's co-defendant, was advised of the availability of a potential robbery victim, yet Defendant continued to assist the decedent by driving him to the scene and waiting, ready to drive away while the decedent got out and assaulted the robbery victim.  Defendant only drove away after a man, the victim's boyfriend who announced himself as a deputy, came to the victim's aid.  The forces which ultimately led to the decedent's death had already been set in motion with Defendant's participation as a getaway driver.  It is apparent that the facts adduced at trial suggest that Defendant did not decide to abandon the robbery attempt so long as there appeared to be a chance of the robbery succeeding.  The testimony of both the victim eye-witness, and of Defendant, was that the Defendant stood by while the victim was attacked, and only fled the scene when the robbery appeared to be meeting armed resistence.  Such an action does not make the robbery attempt that had been occurring up to that point, in Defendant's presence, an independent act.  There was no basis for an independent act defense or jury instruction, therefore, counsel was not ineffective for failing to request such an instruction.

Moreover, the record indicates that counsel considered whether to request an independent act instruction and that he decided not to ask for such an instruction because to do so would have put the defense in a position of advancing facts that conflicted with the defense that was argued to the jury.

| The Court: | The principal, of course, will be given. Are there any special or, let me say unusual jury instructions? By that, I mean, those not -- that are not in given in most -- in most cases? |
|---|---|
| Mr. Harrison: | No, I do not believe so, your Honor. In this case, we're not admitting that he was involved in a crime itself, so we're not asking for the independent act or . . . |
| The Court: | Okay. |
| Mr. Harrison: | Our defense is that he didn't know. |

Where, as here, the defense attorney takes an action based upon strategy, such a reasonable tactical decision cannot be used as a basis for a finding of ineffective assistance of counsel. *See State v. Williams*, 797 So. 2d 1235, 1239 (Fla. 2001) (counsel cannot be deemed ineffective for failing to pursue the voluntary intoxication defense as such a defense would have been inconsistent with theory of the case).

Defendant avers in ground two of his Motion that counsel was ineffective for failing to request independent act defense instruction (in conjunction with ground one) where evidence shows acts of co-felon resulting in murder (or co-felon being killed) were independent from the underlying felony and for failing to argue this defense theory. Defendant appears to be arguing that counsel was ineffective for failing to advance the additional independent act argument that the deputy's killing of the decedent was beyond what Defendant could reasonably have foreseen as a consequence of a mere strong armed robbery of the victim. However, this argument is without merit. *See Tison v. Arizona*, 481 U.S. 137, 151 (1987) (the possibility of bloodshed is inherent in the commission of any violent felony and this possibility is generally foreseeable and foreseen).

More specifically, neither an independent act theory of defense, or a jury instruction for the same is maintainable on the basis of such an argument. *See Jones v. State*, 804 So. 2d 551, 552 (Fla. 3d DCA 2002) (independent act instruction was not proper where defendant admitted planning armed robbery because the acts of robbing store and killing victim were in furtherance of the plan

and a natural and foreseeable culmination). The circumstances related by
Defendant in ground two provide no more basis for a valid independent act
instruction than did the facts and argument contained in ground one of the Motion.

(App. D. at 261-63.)

Petitioner maintains that the state court based its application of *Strickland* on an
unreasonable determination of the facts. *See* Doc. No. 31 at 80.

In rejecting Petitioner's ineffective assistance claim, the trial court first concluded that
Petitioner would not have been entitled to the independent act instruction because the elements of
independent act did not apply to the facts of his case. The court premised its finding on the
assumption that Petitioner (1) knew that the robbery was going to occur that night, (2) intended
to assist Brian Turner in the robbery by driving him to the scene and waiting to act as the
getaway driver, and (3) knew he was witnessing Brian Turner commit a robbery. These
assumptions, however, were not reasonable in light of the evidence presented at trial.
Specifically, there was no evidence presented to rebut Petitioner's testimony that he thought he
was driving Brian Turner to a drug deal. Petitioner admitted that Brian Turner received a call
about a possible robbery, but did not admit what the state court implicitly claims he admitted:
that he knowingly participated in or assisted with that robbery. In fact, Petitioner's testimony was
just the opposite, denying that he agreed to help Brian Turner with the "sweet lick" or that he
ever intended to do so.

As previously noted, there was ample evidence presented to warrant giving the
independent act instruction because it supported Petitioner's theory of defense and there was no
unrebutted evidence presented that he knowingly participated in the attempted robbery. As such,
the state court's implicit determination that Petitioner admitted participating in the robbery, and

its explicit determination that Harrison would not have been successful in obtaining the independent act instruction because the facts adduced at trial did not permit it were both unreasonable determinations in light of the evidence presented.

The state court next concluded that Harrison did not render ineffective assistance because seeking the instruction would have put him in the position of presenting conflicting defenses. This conclusion was clearly unreasonable. It assumes (1) that the "common design" or "unlawful act" to which Petitioner would have had to admit was the attempted robbery and (2) that the unforeseeable consequence of the robbery was the killing of Brian Turner. These assumptions, however, are incorrect and ignore the evidence presented at trial, as well as Petitioner's arguments in support of this claim in his Rule 3.850 motion -- specifically, that the "common design" or "unlawful act" contemplated by Petitioner was the drug deal, not the robbery.

Moreover, even though Harrison testified that he made a strategic decision to not argue an independent act defense, he did not actually abide by that strategy. Instead, he tried the case on an independent act theory, presenting his client's testimony and his own argument that his client thought he was driving to a drug deal.

Finally, the state court's determination that Petitioner could not demonstrate prejudice was also based on an unreasonable determination of the facts. The state court concluded that there was no prejudice because there was no reasonable probability that the instruction or defense would have resulted in a different outcome. However, this determination was also premised on the incorrect assumption that the independent act instruction was inapplicable to Petitioner's case,

despite Petitioner's testimony that supported it and which would have compelled the trial court to give it had it been requested, perhaps resulting in Petitioner's exoneration.[13]

To the extent Respondents maintain that the state court's determination of these factual issues should be presumed correct pursuant to § 2254(e)(1), the Court finds that Petitioner has met his burden of rebutting the presumption of correctness by clear and convincing evidence. *See Parker*, 244 F.3d at 835-36; 28 U.S.C. § 2254(e)(1).

In sum, the state court's conclusion that Harrison did not render ineffective assistance was based on an unreasonable determination of the facts in light of the evidence presented. Petitioner has met his burden under § 2254(d), and habeas relief is warranted.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Claims one and two of the Petition for Writ of Habeas Corpus (Doc. No. 5) filed by Ronard McCree are **GRANTED** to the extent that the Court finds trial counsel to have rendered ineffective assistance by failing to request the independent act jury instruction.

2. The Writ of Habeas Corpus shall issue, and Ronard McCree shall be unconditionally released unless the State of Florida schedules a new trial within ninety (90) days from the date of this Order.

---

[13]It also ignores the special problem posed by the language of the jury instructions that Petitioner's admission of participation in one crime -- the drug deal -- could result in him "admitting" knowing participation, as a principal, in the robbery.

3.    The effect of this Order will be automatically stayed pending resolution of any

appeal taken to the Eleventh Circuit Court of Appeals.

4.    The Clerk of the Court is directed to enter judgment and close this case.

**DONE AND ORDERED** in Orlando, Florida, this 10thday of September, 2009.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies to:
pslc 9/10
Counsel of Record
Ronald McCree